UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,                    :
                                             :
                        Plaintiff,           :
                                             :          **<u>MEMORANDUM AND ORDER</u>**
                -against-                    :          07-CR-425 (DLI)
                                             :
O'NEAL ROBERTS,                              :
                                             :
                        Defendant.           :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Defendant is charged with possession of five kilograms of cocaine, a controlled substance, with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). Defendant seeks to suppress statements that he made to law enforcement officers during the course of three proffer sessions and in connection with his cooperation with the government's investigation into narcotics trafficking at John F. Kennedy International Airport ("JFK"). He contends that the government obtained these statements in violation of his Fifth and Sixth Amendment rights to counsel, and by economic coercion. (Docket Entry No. 36.) Additionally, he contends, for the first time in post-hearing submissions, that the statements cannot be admitted against him as he is protected by Rule 410 of the Federal Rules of Evidence and Rule 11 of the Federal Rules of Criminal Procedure. The government opposes defendant's motion in its entirety. (Docket Entry No. 40.) For the reasons set forth more fully below, defendant's motion is denied in its entirety.

**BACKGROUND**

Prior to his arrest, defendant worked as a crew chief for American Airlines at their JFK hub for eighteen years. (Def. Aff. ¶ 3.) On October 11, 2006, law enforcement officers arrested defendant for narcotics possession. (Def. Aff. ¶ 2.) On October 12, 2006, defendant was

arraigned before a magistrate judge who assigned Michael Schneider, Esq. from the Federal Defenders' Office to represent him. (Def. Aff. ¶ 4.) Defendant subsequently retained an attorney on his own, John Moore, Esq., to represent him. Defendant first met with Mr. Moore on October 13, 2006 at the Brooklyn Metropolitan Detention Center ("MDC"). (Def. Aff. ¶ 4.) Defendant was next scheduled to appear in court on October 16, 2006 for a detention hearing. (Def. Aff. ¶ 5.) On October 16, 2006, defendant was brought to the courthouse for the detention hearing. (Def. Aff. ¶ 6.) The parties have provided conflicting stories as to what happened next.

## I.    Motion to Suppress

### A.    Defendant's Motion

Defendant contends that, on October 16, 2006, while in a holding cell at the courthouse, two federal agents, Christian Andretta and Danny Lee, removed him from his cell and transported him to the United States Attorney's Office ("USAO"). There, he met with Assistant United States Attorney ("AUSA") Steven D'Allessandro and other unidentified individuals. (Def. Aff. ¶¶ 6-10.) At this meeting, AUSA D'Allessandro allegedly told defendant that he could return to work only if he cooperated with their investigation. (Def. Aff. ¶ 12.) Defendant thereafter agreed to cooperate. (Def. Aff. ¶ 13.) Agents Andretta and Lee then returned him to the courthouse and told him not to talk to anyone about his cooperation. (Def. Aff. ¶¶ 15-16.) Defendant claims that this meeting occurred outside the presence of his attorney and that he committed to cooperating with the government without the benefit of counsel. (Def. Aff. ¶¶ 17-23.) Defendant further alleges that, prior to this meeting, he did not have any conversations with either of his attorneys about the benefits and consequences of participating in proffer sessions and cooperating as neither of his attorneys were aware that he would be meeting with the government on October 16, 2006.

### B.    Government's Opposition

The government submitted interview notes and affirmations from the law enforcement officers involved with the investigation that present a different account of the events in question. The interview notes purport to summarize proffer sessions held on October 16, 2006, October 31, 2006, and November 2, 2006.  The notes indicate that defendant attended these sessions with John Moore, his attorney at that time.[1]  (Gov't Mem. Exs. C-E.)  The government also submitted a copy of a proffer agreement with a type-written date of October 16, 2006 that defendant and his attorney signed.  (Gov't Mem. Ex. B.)  The parties also placed their initials and the date October 31, 2006 next to their signatures.  (*Id.*)

Agent Lee indicated that, on October 16, 2006, he transported defendant from a holding cell at the courthouse to the USAO's for a proffer session.   According to Agent Lee, the following individuals were present at that session:   AUSA D'Allessandro, Immigration and Customs Enforcement ("ICE") Group Supervisor James Modico, ICE Special Agent Christian Andretta, Port Authority Police Department ("PAPD") detective Donald McMahan, defendant, and John Moore, defendant's attorney.  (Lee Affirm. ¶ 6.)  At the beginning of the meeting, defendant and his attorney met privately to discuss a proffer agreement the government provided them, which defendant signed before the parties began discussing the investigation.  (Lee Affirm. ¶¶ 7-8.)  According to Agent Lee, defendant made incriminating statements.  Additionally, he agreed to cooperate with the investigation, to meet with law enforcement officers outside the presence of counsel in furtherance of his cooperation, and to return to work wearing a recording device.  (Lee Affirm. ¶ 9.)

---

[1]    Defendant has since retained new counsel, Gregory Blackman, Esq., who replaced Mr. Moore.

Agent Andretta's account of the October 16, 2006 proffer session was consistent with that of Agent Lee. (Andretta Affirm. ¶ 6.) Agent Andretta also stated that she was present at a November 2, 2006 proffer session, during which the same procedures with respect to the proffer agreement were followed: (i) defendant and his attorney were given a proffer agreement, (ii) defendant and his attorney privately reviewed it and conferred, and (iii) defendant and his attorney signed it. (Andretta Affirm. ¶ 9.)

Agent Andretta also stated that she was present at a proffer session held on July 30, 2008 attended by defendant and his most recently retained counsel, Gregory Blackman. During this session there was no proffer agreement in place. (Andretta Affirm. ¶ 10.) At that meeting, defendant indicated, among other things, that he had signed proffer agreements at prior proffer sessions.

AUSA D'Allessandro asserts that on October 16, 2006, John Moore, defendant's attorney at that time, was present at the proffer session. (D'Allessandro Affirm. ¶ 6.) Prior to the start of the proffer session, AUSA D'Allessandro provided defendant and his attorney with a proffer agreement and gave them time to review and discuss it privately. (D'Allessandro Affirm. ¶ 7.) Defendant indicated that he and his attorney discussed it and then defendant signed it. (D'Allessandro Affirm. ¶ 8.) The government then interviewed defendant and defendant agreed to cooperate with their investigation. (D'Allessandro Affirm. ¶ 10.) Defendant returned to work at JFK and wore a recording device, which recorded all of his conversations. (*Id*.) Defendant and his attorney met with the government for two additional proffer sessions held on October 31, 2006, and November 2, 2006, both of which were protected by the proffer agreement. (D'Allessandro Affirm. ¶¶ 11-12.)

John Moore, defendant's attorney at the time of the first proffer session (and subsequent sessions), submitted an affidavit affirming that he attended a proffer session held on October 16, 2006 at the USAO's office. (Moore Affirm. ¶ 4.) Moore also indicated that, at the beginning of the meeting, AUSA D'Allessandro gave him and defendant a proffer agreement, which they reviewed privately, and then signed. (Moore Affirm. ¶¶ 5-6.) The government interviewed defendant at this meeting and defendant agreed to cooperate. (Moore Affirm. ¶ 7.) The parties then proceeded to the courthouse for the previously scheduled appearance. (Moore Affirm. ¶ 8.) The parties then met for additional proffer sessions on October 31, 2006, November 2, 2006, and March 15, 2007. (Moore Affirm. ¶¶ 9-13.) Mr. Moore was present at each of these sessions.

## II.    Suppression Hearing

To resolve the discrepancies between the affirmations of the defendant and various government witnesses, the court conducted a suppression hearing on January 22, 2009 and January 27, 2009.[2] Several witnesses testified, including defendant, Mr. Schneider, Mr. Moore, AUSA D'Allessandro, and Agents Shand, Lee, and Andretta.

### A.    Defendant

Defendant's testimony on direct tracked the assertions contained in his affidavit. He indicated that his first and only meeting with Mr. Schneider occurred at the prison on October 12, 2006, prior to his arraignment, and that they did not discuss proffer sessions. (Jan. 22 Tr. 62-63.) Defendant testified that he met with Mr. Moore on October 13, 2006, and that Mr. Moore did not mention the scheduled proffer session and did not explain the benefits and consequences of such sessions. (Jan. 22 Tr. 63-65.) Defendant had no prior notice of the proffer session from his attorneys or the government. (Jan. 22 Tr. 66.)

---

[2]    "Jan. 22 Tr." refers to the transcript for the portion of the hearing held on January 22, 2009. "Jan. 27 Tr." refers to the transcript for the portion held on January 27, 2009.

On October 16, 2006, defendant was transported to the courthouse for a bail hearing. He testified that he then was taken from a holding cell at the federal courthouse to the USAO where he signed a log book. (Jan. 22 Tr. 65-67.) Defendant met with unspecified Port Authority officers, Agent Shand, and AUSA D'Allessandro. (Jan. 22 Tr. 68-69, 72.) Defendant's attorney, Mr. Moore, was absent from this meeting. (Jan. 22 Tr. 70, 74-75.) Defendant agreed to assist the government in its investigation of drug trafficking at JFK by gathering information and wearing a recording device. (Jan. 22 Tr. 70-74.) Defendant testified that he did not sign any agreement at this meeting. (Jan. 22 Tr. 74.) At the conclusion of the meeting, the agents returned him to the courthouse for his appearance.

Defendant claimed that he met briefly with Mr. Schneider at the courthouse prior to his appearance, at which point Mr. Schneider told him that cooperating was a "good idea." (Jan. 22 Tr. 75.) Defendant claimed that Mr. Schneider represented him initially at that court appearance, and then was relieved by Mr. Moore. (Jan. 22 Tr. 76.) Defendant indicated that the parties informed the judge of his cooperation. (Jan. 22 Tr. 76-77.) The judge released defendant on bail. Afterwards, Mr. Moore met with the government on his own. (Jan. 22 Tr. 77-78.) Defendant returned to work at JFK and before each shift he met with government agents. (Jan. 22 Tr. 79.)

During cross-examination, the government confronted defendant with the transcript of the October 16, 2006 bail hearing. (Jan. 22 Tr. 164, Gov't Ex. 11.) The transcript indicates that Mr. Moore represented defendant for the entire hearing and that Mr. Schneider did not make any appearance on the record whatsoever. (*See generally* Bail Hrg. Tr.) When asked about this inconsistency with his testimony, defendant insisted that Mr. Schneider represented him for at least a portion of the appearance. (Jan. 22 Tr. 164-65.) Similarly, the transcript indicates that

Mr. Moore informed the court that *both he and defendant* met with the government before the hearing. (Jan. 22 Tr. 166; Bail Hrg. Tr. 10-11) (emphasis added). When asked about this portion of the transcript, defendant stated that Mr. Moore and AUSA D'Allessandro lied to the court regarding the meeting. Defendant did not ask them to correct their statement or inform the court that he attended the proffer session without his attorney because he did not think that detail was important. (Jan. 22 Tr. 166-70.)

Defendant and his attorney met with the government on October 31, 2006 and November 2, 2006. (Jan. 22 Tr. 79, 91.) According to defendant, at each of these meetings the government told him that he was not giving them enough information and that he needed to give them more information including his involvement in the conspiracy. (Jan. 22 Tr. 81-88.) He claimed that his attorney encouraged him to make incriminating statements. (Jan. 22 Tr. 82-83, 97.) If he did not make these statements, the agents would not let him return to work at the airport. (Jan. 22 Tr. 83-86, 89-90, 96, 100.) Thus, to keep his job, defendant made statements to the government regarding his involvement and the involvement of other employees in the conspiracy. (Jan. 22 Tr. 85, 99-100, 102, 152.) He further claimed that, when he was unable to supply the government with any new information on the conspiracy, he was told that he could not return to work at the airport until he heard from his attorney that the government had authorized his return. (Jan. 22 Tr. 89-90.) Ultimately, the government "pulled the plug" on his cooperation, and required him to surrender his security pass, which he claimed rendered him unable to work return to work. (Jan. 22 Tr. 111-13.)

On cross-examination, defendant admitted that the statements he made during the proffer sessions regarding the conspiracy were lies and that he implicated other airport employees in

crimes that they did not commit.  (Jan. 22 Tr. 151-53.)  When asked, defendant refused to admit

that he told these lies because it was in his interest to lie.  (Jan. 22 Tr. 153.)

In his direct testimony, defendant claimed that he first signed a proffer agreement on

October 31, 2006.  (Jan. 22 Tr. 105-06.)  His attorney told him to sign it, date it, and initial his

signature.  (Jan. 22 Tr. 107, 109.)  Defendant did not have the opportunity to discuss the

document with his attorney before signing it.  (Jan. 22 Tr. 107-08.)  Defendant did not have time

to read it before signing it.  (Jan. 22 Tr. 108.)  Defendant did not understand the agreement (Jan.

22 Tr. 108-09), but told the government and his attorney that he did (Jan. 22 Tr. 109).  Defendant

could not recall if he signed a proffer agreement at the November 2, 2006 session, or if the

agreement from the October 31, 2006 session was still in place at that meeting.  (Jan. 22 Tr. 109-

10.)  On cross-examination defendant conceded that the document states:  "The meeting to which

this agreement relates to occurred on October 16, 2006."  (Jan. 22 Tr. 137; Gov't Ex. 1.)

Further, he conceded that the type written date on the agreement is October 16, 2006.  (Jan. 22

Tr. 137.)  Defendant admitted that he noticed this date, but that he did not request it to be

changed to reflect what he asserts was the true date they signed it—October 31, 2006.

Nonetheless, he signed it.  (Jan. 22 Tr. 137-39.)

At the hearing, the government produced the original agreement.  (*See* Gov't Ex. 1.)  A

review of the original agreement indicates that each signatory to the agreement, including

defendant, used one pen to sign their name on October 16, 2006 and another pen to write their

initials and date of October 31, 2006 next to their signature.  This difference is clear as the

signatures reflect the use of different pens by the different colors of ink and the different widths

of ink (indicative of the use of ball point and felt tip pens).  Defendant denied that he used two

separate pens; however, he conceded that it appeared that the other signatories used different

pens for signing and initialing the agreement. (Jan. 22 Tr. 141-43.) Defendant incredibly denied that the parties used one pen on October 16, 2006 to sign their names, and a different pen on October 31, 2006 to date and initial their signatures. Instead, they used different pens to complete the signing and initialing all on one day, October 31, 2006. (Jan. 22 Tr. 142-43.) Additionally, defendant admitted that, during the meeting in which he signed the agreement, he lied to AUSA D'Allessandro when asked if he understood the agreement to return to work. (Jan. 22 Tr. 139.)

On cross-examination, defendant stated that he was never offered the opportunity to have an attorney. The government produced a financial affidavit that defendant completed and signed on October 12, 2006, in support of his application for appointed counsel. (Jan. 22 Tr. 127; Gov't Ex. 10.) When confronted with this form, defendant stated that he did not understand it and that he just signed it. (Jan. 22 Tr. 128-29.) When confronted with the detailed information regarding defendant's finances and family, defendant stated that he never filled out the form, no one discussed the form with him, he did not understand it, and that he just signed it without understanding it and without the benefit of counsel. (Jan. 22 Tr. 128-31.)

Finally, for the first time during the pendency of this case, on direct defendant asserted at the hearing that he was questioned prior to being given a *Miranda* warning upon his arrest. (Jan. 22 Tr. 47.) The court discussed the issue with the attorneys and, in an abundance of caution, permitted the parties to address this issue at the hearing with the appropriate witnesses. (Jan. 22 Tr. 47-55.) According to defendant, three agents questioned him for a period of thirty minutes prior to *Mirandizing* him. (Jan. 22 Tr. 55-56.) They then presented him with a form and discussed his rights. He testified that he did not read the form, did not understand it, and did not

understand what the agents were explaining to him.  (Jan. 22 Tr. 56-57.)  Nonetheless, he signed the form.  (Jan. 22 Tr. 59.)

During cross-examination, defendant admitted that he read the top line of the form, which indicated that the agents must read him his rights before questioning him.  (Jan. 22 Tr. 121.)  He stated that he signed the form indicating that he had not been questioned prior to being read his rights.  (*Id.*)  The government then read several portions of the form to the defendant, ascertaining whether he read that portion, and what he did or did not understand about it.  (Jan. 22 Tr. 121-26.)  For example, the government highlighted the second line on the form:  "You have the right to remain silent."  (Jan. 22 Tr. 121.)  Defendant indicated that he understood what the word "silent" meant.  (Jan. 22 Tr. 121-22.)  When the government then asked defendant if his earlier testimony that he did not read or understand the form was a lie, defendant "asked [the government] to rephrase it."  (Jan. 22 Tr. 122.)  The government rephrased the question and defendant admitted that he lied during direct.  (Jan. 22 Tr. 123.)  With respect to the right to have an attorney, defendant incredibly stated that at the time he signed the form, he did not know what an attorney was.  (Jan. 22 Tr. 123-24.)  He did not think it was important to ask the agents to explain the word "attorney" to him.  (Jan. 22 Tr. 124.)  Defendant admitted that he lied when he signed the form because lying was in his interest.  (Jan. 22 Tr. 125-26.)

### B.    Schneider

Mr. Schneider, defendant's first attorney, testified that he was appointed to represent defendant on October 12, 2006.  (Jan. 22 Tr. 32.)  Mr. Schneider scheduled a proffer session with the government for October 16, 2006.  (Jan. 22 Tr. 33.)  Mr. Schneider testified that his electronic calendar contained a record indicating that the proffer session was scheduled for October 16, 2006.  (Jan. 22 Tr. 34.)  Mr. Schneider did not attend the proffer session with

defendant because defendant's family had retained new counsel for him shortly after his arrest. Mr. Schneider could not remember if he had a conversation with defendant about the consequences and benefits of proffer sessions, but indicated that it is his practice to have such communications prior to scheduling proffer sessions with the government. (Jan. 22 Tr. 35.) Additionally, it is his practice to schedule proffer sessions only after the client indicates that he or she is interested in proceeding with such a session. (*Id*.)

### C.    Moore

With respect to the October 16, 2006 proffer session, Mr. Moore testified that (i) he attended the session, (ii) the government presented defendant with a proffer agreement at the beginning of the meeting, (iii) the government gave Mr. Moore and defendant time to discuss it privately, (iv) Mr. Moore explained the agreement and the benefits and consequences of it with defendant, (v) AUSA D'Allessandro explained the document to defendant, and (vi) defendant signed the proffer agreement. (Jan. 22 Tr. 179-90.) Mr. Moore testified that, at the October 31, 2006 proffer session, the parties initialed and dated the proffer agreement next to the signatures that they had placed on the agreement on October 16, 2006. (Jan. 22 Tr. 192.) Mr. Moore did not recall the government ever threatening defendant with loss of his employment. (Jan. 22 Tr. 196.) Further, no representatives of American Airlines attended any of the proffer sessions or made any threats to defendant. (*Id*.)

### D.    Shand

Agent Shand testified that she read defendant his *Miranda* rights once he was arrested, that defendant read them himself, and indicated that he understood them. (Jan. 22 Tr. 213-15.) Agent Shand testified that no government employees threatened defendant's employment and that there were no airline personnel at the proffer sessions. (Jan. 22 Tr. 226.) Agent Shand

indicated that, if an individual with special security clearance is arrested, that person will no longer retain clearance post-arrest. (Jan. 22 Tr. 238-39.) If ICE arrests an employee with such clearance, ICE must report that arrest to Customs Border Patrol, the agency responsible for awarding and revoking security clearances. (Jan. 22 Tr. 239.)

### E. Lee

Agent Danny Lee testified that, on October 16, 2006, he transported defendant from the courthouse to the USAO's for a proffer session. (Jan. 27 Tr. 9.) Defendant's attorney attended the proffer session. (Jan. 27 Tr. 10.) Defendant and his attorney signed a proffer agreement, after being given time to consult privately. (Jan. 27 Tr. 10-11.) Agent Lee signed the proffer agreement on October 16, 2006 and did not attend any subsequent proffer sessions. (Jan. 27 Tr. 11-14.) None of the law enforcement officers present threatened defendant with the loss of his job. (Jan. 27 Tr. 14-15.)

### F. Andretta

Agent Christian Andretta testified that none of the agents questioned defendant post-arrest until he was *Mirandized*. (Jan. 27 Tr. 25.) Defendant's attorney attended the October 16, 2006 proffer session. (Jan. 27 Tr. 26.) Agent Andretta could not specifically recall if a proffer agreement was in effect on October 16, but stated unequivocally that one was in place on October 31. (Jan. 27 Tr. 29.) None of the law enforcement officers ever threatened defendant with the potential of job loss if he did not cooperate. (Jan. 27 Tr. 30-31.)

### G. D'Allessandro

AUSA D'Allessandro testified that he and Mr. Schneider scheduled a proffer session for October 16, 2006. (Jan. 27 Tr. 46.) AUSA D'Allessandro spoke to Mr. Moore after defendant retained him, and they agreed to keep the proffer session as scheduled. (Jan. 27 Tr. 47.)

Defendant and Mr. Moore attended the October 16, 2006 proffer session. (*Id*.) The parties signed a proffer agreement at that session. (Jan. 27 Tr. 47; Gov't Ex. 1.) The proffer agreement remained in effect at the October 31, 2006 proffer session and the parties initialed and dated their earlier signatures. (Jan. 27 Tr. 50.)

## FACTUAL FINDINGS

In making the foregoing factual findings, the court considered the testimony and credibility of the witnesses, and the motion papers, supporting affidavits, and exhibits submitted in connection with this motion. The court finds defendant's assertions and testimony unworthy of belief. To the contrary, the court finds the testimony of the other witnesses to be completely credible as their testimony was consistent and they corroborated one another. There is ample evidence to support these credibility findings.

Defendant admitted that he lied on the stand during his direct testimony and then again on redirect with respect to material issues. (Jan. 22 Tr. 120-21, 123, 176.) Defendant admitted to lying in his affidavit in support of this motion; and then when asked if the resolution of the instant motion was important to him, defendant stated repeatedly and unbelievably that he did not understand the question. (Jan. 22 Tr. 156.) Defendant admitted that he lied to the government during proffer sessions about his involvement in the conspiracy, and more importantly, about the involvement of other individuals, potentially subjecting those individuals to unwarranted criminal liability. (Jan. 22 Tr. 95-88, 91-93, 95-102.) Further, he claimed he lied to law enforcement officers by indicating that he understood his *Miranda* warnings and the proffer agreement and now asserts that he did not. (Jan. 22 Tr. 109, 120-21, 123.) These assertions are belied by the consistent testimony of other witnesses, including defendant's two prior attorneys, which proves otherwise.

At times during cross-examination, to avoid hurting his case, defendant was unwilling to provide the government with the only logical and viable answer to its questions. (Jan. 22 Tr. 158-61.) Defendant claimed repeatedly that he did not understand the questions posed. When the court rephrased questions in simpler or more elemental forms, defendant continued asserting that he did not understand and ceased making eye-contact.

There are numerous inconsistencies in defendant's testimony. For example, he claimed that the parties signed the proffer agreement on October 31, 2006, and then later stated that Agent Lee (who also had signed the agreement) was present at only one proffer session, the October 16, 2006 session. (*See* Gov't Ex. 1; Jan. 22 Tr. 65-66, 90-81, 150.) Thus, by defendant's own testimony, Agent Lee could only have signed the proffer agreement on October 16, 2006. This fact undermines defendant's assertion that the parties first signed the agreement on October 31, 2006. Further, defendant's testimony was at odds with the transcript of his bail hearing. For example, defendant insisted that Mr. Schneider represented him for a portion of that proceeding, and that Mr. Moore relieved him of his representation during the proceeding. (Jan. 22 Tr. 75-76.) A review of the transcript indicates that Mr. Schneider made no such appearance. (*See generally* Gov't Ex. 11.) That transcript further indicates that the parties informed the court that they had just finished a proffer session and that defendant was cooperating, a factor the court considered in setting bail. (Gov't Ex. 11 at 3-4.)

The shortcomings of defendant's testimony stand in sharp contrast to that of each government witness. Each witness testified that defendant attended the October 16, 2006 proffer session with his attorney and none of them changed their story during cross-examination. Each portion of each witness's testimony was corroborated by the testimony of other witnesses or by that particular witness's standard practices. Additionally, the government supported the

testimony of its witnesses by, among other things, contemporaneous notes of the proffer sessions and the proffer agreement (which was dated October 16, 2006).

With respect to the proffer session held on October 16, 2006, the court makes the following findings: (i) defendant and his attorney at the time, Mr. Moore, attended the October 16, 2006 proffer session, (ii) the government presented them with a proffer agreement and gave them time to review it and discuss it privately, (iii) defendant signed the proffer agreement, and (iv) the proffer agreement remained in place at the October 31, 2006 proffer session, when the parties initialed and dated their earlier signature. The same proffer agreement was still in place for the November 2, 2006 proffer session although it was not initialed by the parties on that day. The court further finds that no law enforcement officers threatened defendant with job loss for failure to cooperate and that no law enforcement officers questioned defendant until they read him his *Miranda* rights, explained him his rights, and he voluntarily and knowingly waived his right to remain silent.

## CONCLUSIONS OF LAW

### I.      Violation of Fifth and Sixth Amendment Rights to Counsel

Defendant argues that the court must suppress all statements made at the October 16, 2006 proffer session because that session, conducted outside the presence of counsel, violated defendant's right to counsel. Defendant further argued that all statements made at subsequent proffer sessions and during the course of his cooperation must be suppressed as fruit of the poisonous tree. As set forth above, the record provided abundant support for finding that defendant's attorney, Mr. Moore, was present at the October 16, 2006 session, and that no proffer sessions occurred on that day or at any time outside the presence of his attorney. There were no violations of defendant's Fifth or Sixth Amendment rights to counsel. *See, e.g.,*

*Edwards v. Arizona*, 451 U.S. 477, 485-86 (1981) ("The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation."); *see also*, *e.g.*, *Massiah v. United States*, 377 U.S. 201, 206 (1964) (holding that the Sixth Amendment right to counsel is violated only when the government obtains statements in the absence of counsel). Thus, defendant's request to suppress the evidence on this ground is denied.

## II.    Economic Coercion

Defendant contends that the court must suppress his statements and any evidence obtained against him by nature of his cooperation, as the government forced him to participate by economic coercion.  Defendant claims that the government repeatedly threatened that he would lose his job if he did not cooperate.

In some instances, economic coercion may render a defendant's self-incriminating statements involuntary.  *See Garrity v. New Jersey*, 385 U.S. 493, 497 (1967) ("The option to lose [the] means of [one's] livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent.").  To constitute economic coercion, "the threat of economic harm must be significant and present the defendant with a clearly defined choice between self-incrimination and the harm."  *United States v. Ferguson*, 06-CR-137 (CFD), 2007 WL 420782, at *7 (D. Conn. Nov. 30 2007) (citing *Garrity*, 385 U.S. at 497); *accord United States v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1975) ("A statement challenged on the ground that it was obtained as the result of economic sanctions must be rejected as involuntary only where the pressure reasonably appears to have been of sufficiently appreciable size and substance to deprive the accused of his free choice to admit, to deny, or to refuse to answer.").

In the instant matter, defendant never faced a clear-cut choice between making incriminating statements and the loss of his job.  First, defendant's employer had nothing to do

with his statements or cooperation.  There were no representatives of American Airlines at any of the proffer sessions.  There is nothing to suggest that American Airlines knew of his arrest or his cooperation, and certainly nothing to suggest that they participated in the alleged coercive conduct.  Second, there is no credible evidence that the government threatened defendant with job loss.  Each of the agents testified that no one, at any time, threatened defendant with his job. AUSA D'Allessandro conceded that he would have notified Customs Border Patrol of the arrest, thereby resulting in the revocation of defendant's special security clearance, had defendant not cooperated; however, this notification and any related statements made to defendant cannot be equated with the threat of his job loss.  AUSA D'Allessandro had a duty to report the arrest. Further, it is American Airlines alone that had the ability to make the decision to terminate defendant.  AUSA D'Allessandro's comments regarding the security clearance are not the functional equivalent of the threat of a job loss.  Defendant merely would not have access to certain secure areas of the airport.  Third, defendant had no reasonable expectation that he would even be released on bail absent the government's understanding that he would cooperate.  (*Cf.* Jan. 22 Tr. 68.)  Thus, at the very least, it was in defendant's penal interest to cooperate and he may have cooperated for this reason or many other reasons that have nothing to do with coercion.  Finally, defendant conceded that the government made no threats to him at the initial proffer session.  (Jan. 22 Tr. 145, 153-54.)  Thus, by his own admission, his cooperation began absent any threats.  Accordingly, his motion to suppress evidence on this ground is denied.


### III.     Proffer Agreement and Waiver of Protections

Defendant asserts for the first time, in post-hearing papers, that, even if his attorney was present at the October 16, 2006 proffer session, a review of the record indicates that defendant could not have knowingly or voluntarily waived the protections afforded criminal defendants under Rule 11 of the Federal Rules of Criminal Procedure ("Rule 11") and Rule 410 of the Federal Rules of Evidence ("Rule 410"). (*See* Def. Closing Mem. at 1-4.) Defendant contends that he first learned of the proffer session when he was transported to the USAO's on October 16, 2006, and that the record indicates that, at the start of that session, he spent no more than a half hour consulting privately with his attorney about the consequences and benefits of proffer sessions and cooperation, and that these facts are insufficient to establish knowing and voluntary waiver. (*See id*.) Despite the belatedness of this argument, the court will address it on the merits.[3]

Generally, statements made during a proffer session are not admissible against a defendant due to the protections set forth in Rule 410.[4] Under Rule 410, "evidence of . . . any statement made in the course of plea discussions with an attorney for the prosecuting authority do not result in a plea of guilty . . . ." F.R.E. 410. A defendant can, however, waive these protections "as long as there is no affirmative indication that the agreement to waive was entered into unknowingly or involuntarily." *United States v. Velez*, 354 F.3d 190, 195 (2d Cir. 2004) (discussing Rules 11 and 410 in the context of a proffer agreement) (quoting *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995). "A waiver is made knowingly if the defendant has a full awareness of both the nature of the right being abandoned and the consequences of the decision

---

3      Defendant should have raised all arguments relating to his suppression motion in his initial moving papers. The facts relating to this argument were known to him at that time.
4      Rule 11(f) cross-references the protections set forth in Rule 410.

to abandon it, and it is voluntary if it is the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. at 196 (internal quotation marks omitted).

In the instant action, the defendant signed a proffer agreement on October 16, 2006, containing the following clause:

> [T]he provisions of Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 do not apply to any statements made by [the defendant] at the Meeting, and [the defendant] shall not assert any claim under these or any other provisions of law that such statements or any leads therefrom should be suppressed.

(Gov't Ex. 1, ¶ 5.) Thus, by signing the proffer agreement, defendant waived the protections of Rule 410. The only issue is whether he knowingly and voluntarily waived those protections.[5]

The record, especially the testimony of the various special agents, AUSA D'Allessandro, and the defendant's prior attorneys unequivocally demonstrates that he did. Mr. Schneider testified that he scheduled the October 16, 2006 proffer session and that it is his practice to schedule proffer sessions only upon consultation with and authorization by a client. (Jan. 22 Tr. 35.) At the start of the proffer session, the government gave a copy of the proffer agreement to defense counsel and gave Mr. Moore and defendant time to discuss it privately. (Jan. 22 Tr. 181-90; Jan. 27 Tr. 10-11, 47.) Mr. Moore testified that he explained the agreement to defendant paragraph-by-paragraph as well as the benefits and consequences of participating in proffer sessions generally. (Jan. 22 Tr. 184, 207.) When the government returned, AUSA D'Allessandro also explained the proffer agreement to defendant. (Jan. 22 Tr. 186; Jan. 27 Tr. 47.) Defendant then signed the proffer agreement, which expressly includes a statement to the

---

[5]     It bears repeating that defendant first asserted this claim in his closing papers, submitted post-hearing. At the time of the hearing, neither the government nor the court were aware of this argument and thus, did not question the witnesses with respect to this issue with the level of detail that may have been desired. Despite this surprise from defense counsel, the court finds that the record established at the suppression hearing is sufficient to permit the court to resolve this claim without reopening the suppression hearing. Further, defense counsel has made no such request.

effect that he understood all the provisions of the agreement. (Gov't Ex. 1.) The court found completely incredible defendant's claims that he did not understand various documents that he signed, including the proffer agreement, or numerous questions posed to him by the government and the court during the hearing, or such basic words as "attorney." (Jan. 22 Tr. 120-21, 123-27.) The court is satisfied that defendant knowingly and voluntarily waived his protections under Rule 410. *See United States v. Parra*, 302 F. Supp. 2d 226, 233-35 (S.D.N.Y. 2004) (holding that the defendant knowingly and voluntarily waived his Rule 410 protections). Defendant's motion is denied on this ground.

## IV.   Miranda Violation

In post-hearing papers, defendant withdrew the motion to suppress to the extent that it was based on the *Miranda* violation first alleged at the hearing during the defendant's direct testimony. (*See* Def. Closing Mem. at 1.) This claim is moot; however, for the clarity of the record in this case, the court denies this claim on the merits as well. The evidence resoundingly supports a finding that law enforcement officers refrained from questioning defendant until after they read him his rights, explained his rights to him, he initialed that he understood each right on a form entitled "Statement of Rights," and he then waived his right to remain silent. (*See* Def. Ex. A; Jan. 22 Tr. 213-15.) There is no credible evidence to the contrary. The government did not obtain the post-arrest statements in violation of the Fifth Amendment. Thus, defendant's motion to suppress on this ground is denied.

## CONCLUSION

For the reasons set forth above, defendant's motion is denied in its entirety.


SO ORDERED

DATED:        Brooklyn, New York
              March 13, 2009


                              _____/s/_____
                                    DORA L. IRIZARRY
                                United States District Judge