UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------ x
                                              :
UNITED STATES OF AMERICA,                     :
                                              :
                          Plaintiff,          :        **OPINION & ORDER**
                                              :
             -against-                        :        07-CR-425 (DLI)
                                              :
O'NEAL ROBERTS,                               :
                                              :
                          Defendant.          :
------------------------------------------------------ X

**DORA L. IRIZARRY, United States District Judge:**

On July 31, 2009, defendant O'Neal Roberts moved, pursuant to Rule 29 of the Federal

Rules of Criminal Procedure, for a judgment of acquittal notwithstanding the jury verdict of

guilty entered against him on June 30, 2009 on charges of cocaine importation conspiracy,

cocaine importation, cocaine distribution conspiracy, and attempt to distribute cocaine.  In the

alternative, defendant moved to vacate the convictions and for a new trial pursuant to Rule 33 of

the Federal Rules of Criminal Procedure.  For the reasons set forth below, defendant's motions

are denied in their entirety.

**I.      BACKGROUND**

Defendant, a former American Airlines employee at John F. Kennedy airport in Queens,

New York ("JFK"), was arrested on October 11, 2006, subsequent to a seizure of cocaine and a

wiretap investigation by Immigration and Customs Enforcement ("ICE") agents.  He was

initially charged with possession of five kilograms of cocaine with the intent to distribute in

violation of 21 U.S.C. § 841(a)(1).  On June 5, 2009, defendant was arraigned on a superseding

indictment charging additional counts of cocaine importation, cocaine distribution, conspiracy to

distribute cocaine, conspiracy to import cocaine, conspiracy to launder money, and money laundering. A jury trial on these charges commenced on June 22, 2009.

### A.   Opening Statements, Testimony of Officer Michael Roessel, and First Request for Admission of Roberts' Statements

During its opening statement, the government indicated, among other things, that the jury would hear from co-conspirator Clive Beckford, who would describe the events surrounding the November 5, 2005 importation and seizure of approximately five kilograms of cocaine. (T. 291-292.) Defense counsel, in turn, stated that the government had relied on bad information provided by Beckford, portions of which did "not add up," which called his account of the November 5th seizure into question. (T. 294-296.) He further described the government's use of information provided by Beckford in its investigation as "reckless." (T. 293-294.)

The government's first witness, United States Customs and Border Protection ("CBP") Officer Michael Roessel, testified that, on November 5, 2005, he witnessed the unloading of American Airlines Flight 1384 from Barbados by a man operating a loader used to remove containers from the plane. (T. 299-307.) In one of these containers were several duct-taped bricks inside a bag, later determined to contain just over five kilograms of cocaine. (T. 302-06.) The defense then questioned Officer Roessel about other people besides the defendant who might have been working on the flight from which the drugs were seized. (T. 313, 319.)

The government then sought leave to introduce into evidence certain statements made by defendant during proffer sessions with the government conducted subsequent to his arrest.[1] (T. 321-22.) The meetings were conducted pursuant to a standard agreement with the government, which provided that the U.S. Attorney's Office was authorized to

---

[1] On March 13, 2009, the court denied defendant's motion to suppress inculpatory statements allegedly made at these meetings, finding *inter alia*, that they were knowingly and voluntarily made in the presence of defense counsel with whom defendant consulted. *See United States v Roberts*, No. 07-cr-425 (DLI), 2009 WL 700188 (E.D.N.Y. March 13, 2009).

use any statements made by [the defendant] (B) as substantive evidence to cross-examine [the defendant], should [the defendant] testify, and (C) as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the defendant] at any stage of a criminal prosecution.

(Proffer Agreement dated 10/31/06 (Def.'s Br. Ex. A) ("Proffer Agmt.") ¶ 3 (the "waiver clause").). During these meetings, the defendant admitted, among other things, his involvement, as well as that of Beckford and other American Airlines employees, in the importation of narcotics. He specifically admitted his involvement in the thwarted November 5th importation.

The government argued that, through his opening statement and cross-examination of Officer Roessel, the defendant had implied that Beckford's account of what happened on the night of November 5, 2005 was false. (T. 321-22.) The government contended that this implication was contradicted by the defendant's prior statements, and that, pursuant to the court's June 16, 2009 ruling on the government's motion in limine, the government should be allowed to introduce the statements as evidence at trial.[2] (T. 321-22, 326-27.)

The court denied the government's request without prejudice, reasoning that it was premature based on the record before the court at that point. (T. 343.) However, the court noted that, during its opening statement and cross-examination of Officer Roessel, the defendant had posited the theory that "the government agents were reckless in their investigation of the case," and "were putting forth testimony from a cooperator whose information they did not corroborate." (T. 324.) The court further noted that "there are statements from the defendant about that event in question that in fact support the testimony of the government's witnesses"

---

[2] On June 16, 2009, pursuant to Federal Rule of Evidence 801(d)(2)(A), the court granted the government's motion *in limine* to admit inculpatory statements made by the defendant during proffer sessions with the government on October 16, October 30, and November 2, 2006, should defendant present any factual assertion, directly or implied, contrary to those statements at trial. *See United States v. Roberts*, 07-cr-425 (DLI), 2009 WL 1706043 (E.D.N.Y. June 16, 2009). The court further ruled that, if the government presented testimony of defendant's prior admissions, defendant would be precluded from cross-examining government witnesses as to defendant's exculpatory denials or recantations of such admissions. *Id.*

and contradict the "theory put forth before the jury by the defense based on the opening statement." (T. 331-32.) The court warned the defense that "should this . . . or some other theory emerge that is contrary to the admissions that were made by the defendant during the proffer statements," it would allow the government to renew its application for their admission. (T. 343-44.)

### B. Clive Beckford's Testimony and the Government's Second Request for Admission of Roberts's Statements

Cooperating accomplice Clive Beckford testified on behalf of the government about the drug smuggling operation and the roles that he, the defendant, and others played in the cocaine importation and distribution conspiracies. (T. 356-57.) Beckford indicated that he was an American Airlines employee at JFK, and the defendant used his position as crew chief at American Airlines to assign members of the conspiracy to offload drugs from certain flights. (T. 357.) Beckford also testified that the defendant paid him between $2,000 and $10,000 on several occasions for his work in furthering the conspiracy and the two had conspired to put drug proceeds on a plane returning to Jamaica. (T. 369-71.)

With respect to the cocaine seizure, Beckford testified that, when he reported to work during the afternoon of November 5, 2005, he saw and spoke with the defendant at the beginning of his shift. (T. 375-76.) According to Beckford, the defendant told him that "something [was] coming off" a Barbados flight that evening, which Beckford understood to mean that drugs would be on that flight. (Tr. 376.) He further testified that he loaded and unloaded baggage from airplanes until his lunch break, and, towards the end of his lunch break, he saw and spoke with another co-conspirator, Victor Bourne, also an American Airlines employee at JFK. (T. 377-78.) That evening, he and Bourne drove a tractor to the gate where the Barbados flight bearing the drugs was stationed, and observed that the gate was swarming with customs agents.

(T. 379.)  Before driving away, he said he observed the defendant unloading the plane with a "Cochran," a vehicle used by airport employees to remove containers from planes.  (T. 379-382.)  Finally, he testified that, if all had gone as planned, the defendant would have given the drugs, which were hidden in a gym bag, to Beckford and Bourne to remove from the airport.  (T. 382-83.)

On cross-examination, Beckford could not recall whether Bourne or the defendant ever used the word "drugs" in describing the contents of the November 5, 2005 Barbados flight.  (T. 409.)  Defense counsel also questioned whether Beckford had actually been in Miami during the November 5, 2005 seizure.  (T. 415.)  Beckford adhered to his direct testimony, even when confronted with a Passenger Activity Report showing that he had been in Miami earlier on November 5th.[3]  (T. 415-417.)  Defense counsel also asked Beckford whether he was working or even scheduled to work on November 5, 2005.  (T. 417.)  Beckford responded that he was not scheduled to work but nonetheless was at the airport during the day.  (T. 417-18.)  He indicated that he never opened the smuggled bricks to determine their content.  (Tr. 420.)

On re-direct examination, Beckford testified that Bourne and the defendant had told him that the brick objects that they were removing from the flights contained cocaine (T. 431-32.)  Beckford also reasserted that he was at the JFK on November 5, 2005 when the seizure occurred.  (T. 437-38.)

Following Beckford's testimony, the government renewed its motion to introduce the defendant's proffer statements into evidence.  The government contended that the defense counsel's questioning inferred, contrary to defendant's proffer statements, that Beckford had

---

[3] The Passenger Activity Report also showed that Beckford's flight from Miami arrived at JFK before the arrival of the Barbados flight.

fabricated his testimony about the events of November 5 and had not been present at JFK to observe the seizure.  (T. 444.)

The court agreed with the government that Beckford's cross-examination, especially concerning his whereabouts on November 5 and the production of the Passenger Activity Report, could cause the jury to infer that the defense had proof Beckford was not at JFK at the time of the seizure, contrary to defendant's admission that Beckford was there.  (T. 445, 449.)  However, in balancing the probative value of the statements against prejudice to the defendant, the court denied the motion, without prejudice, finding that the government could still argue at closing that, even if Beckford had been in Miami on November 5, 2005, he could have returned to JFK in time to observe the seizure.  (T. 451-52.)

### C.    Third Request for Admission of Roberts's Proffer Statements and Testimony from Charles Schmidt and Special Agent Heather Shand O'Malley

After the court denied its second request for admission of the defendant's statements at the proffer sessions, the government moved for reconsideration of the issue.  (T. 462.)  The court adhered to its prior decision in denying the motion.  (T. 462-63, 480.)  However, defense counsel indicated that the government had provided him with additional evidence regarding Beckford's whereabouts on November 5, 2005, namely, American Airlines passenger flight records and records showing Beckford's swipe card access activity at JFK.  (T. 464.)  The defense argued that "[t]here's nothing to prove [Beckford] was there [at JFK] other than his own statements which have now been contradicted," since "obviously [he] wasn't there until 9:38 p.m. if he was there at all."  (T. 470.)

After hearing further argument, the court ruled that, "[i]f defense counsel pursues this avenue and puts in other evidence pertaining to whether Beckford was there or not," it would allow the government to introduce the proffer statements on rebuttal.  (T. 481.)  The court

reasoned the defense had called into question "whether or not Mr. Beckford ever spoke at all to Mr. Roberts and also whether or not he was . . . where he said he was in relation to the international flight . . . that contained the drugs" seized on November 5, 2005. (T. 473-74.) Defense counsel indicated that he wanted to proceed with admission of records relating to Beckford's travel activities on November 5, 2005 notwithstanding the court's ruling. (T. 481-82.) Accordingly, the court indicated held it would allow the government to introduce relevant portions of the proffer statements in issue. (T. 481-82.)

The government subsequently introduced testimony from American Airlines senior security representative Charles Schmidt, the custodian of the employee travel and swipe card access records. (T. 482.) Schmidt testified the documents showed that, on November 5, 2005, Beckford traveled on a flight from Kingston, Jamaica to Miami, Florida, and then on a flight from Miami to JFK, arriving at 9:38 p.m. (T. 491-94.) He further testified that, according to the access records, Beckford had not used his employee swipe card at JFK until shortly after midnight on November 6, 2005. (T. 495.) Schmidt indicated that it is impossible for an employee to go between a terminal where flights arrive and the secure ramp area where planes are unloaded without using a swipe card to gain access, unless he "piggybacks," that is, by following a person entering the secure area without swiping himself. (T. 496-97.) On cross-examination, defense counsel elicited testimony that Beckford did not arrive at JFK until 9:38 p.m. on November 5, 2005. Schmidt also reiterated his testimony that "it is not possible to go into the ramp from the terminal without a swipe card," and that, in 2005, there were no security cameras monitoring whether employees or others gained access to certain secure areas by piggybacking. (T. 498-502.)

The government also called Immigration and Customs Enforcement ("ICE") Special Agent Heather Shand-O'Malley. Consistent with the court's ruling, Special Agent O'Malley testified regarding statements made by the defendant at the November 2, 2006 proffer meeting. She testified that the defendant admitted that, on November 5, 2005, among other things, he called Beckford to let him know that defendant had spoken with Bourne, and that Bourne needed him to remove bags from the Barbados flight. (T. 522.) The defendant further said Beckford informed him that he was in the terminal and would be on the ramp to assist. (T. 525.) According to Special Agent O'Malley, the defendant also reported that: (1) the Barbados flight had arrived early; (2) he had seen Victor Bourne on a tractor at the flight, and (3) Bourne and Beckford had unloaded baggage from the Barbados flight while the defendant operated the Cochran. (T. 522.)

Finally, the government called ICE Special Agent William Terence McAlpin, who testified as an expert in the pricing of cocaine and methods and practices of smuggling narcotics. (T. 545.) He testified that the government seized 5.04 kilograms of 84% pure cocaine. (T. 546.) A conservative estimate of the wholesale value of that cocaine in New York City in November 2005 was about $121,000. That cocaine also had an approximate retail value of $403,000.

### D. Clive Beckford's Defense Testimony and Closing Arguments

After the government rested, the defense called Beckford as a defense witness, and further explored his recollection of the events of November 5, 2005, prior to the cocaine seizure.[4] (T. 596-605.) Beckford maintained that he had been in JFK that afternoon, even when confronted with records showing that he had not arrived at JFK from Miami until 9:38 p.m.

---

[4] On June 25, 2009, at the conclusion of the government's case-in-chief, the court granted defendant's motion for a judgment of acquittal on the money laundering conspiracy and money laundering charges brought under 18 U.S.C. § 1956(a)(2)(B)(i). *See United States v. Roberts*, 650 F. Supp. 2d 219 (E.D.N.Y. 2009).

(T. 606-14.)[5]

Defendant argued on summation that the jury should question Special Agent O'Malley's recollection of defendant's statements on the possibility that the agents had trouble understanding defendant because of his West Indian accent. (T. 722-24.) The government countered that, in deciding whether to credit defendant's proffer statements, the jury should take into account that defendant was trying to cooperate and get a deal similar to Beckford's. (T. 728.)[6] The government noted that the defendant was represented by counsel at the meeting and had time to think about his statements to the government. (T 728.)

On June 30, 2009, the jury rendered a guilty verdict on all the narcotics charges.

## II.     DISCUSSION

### A.     Rule 29 Motion for Judgment of Acquittal Notwithstanding the Verdict

Rule 29 of the Federal Rules of Criminal Procedure provides that, on a defendant's motion after the verdict, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). The defendant argues that the evidence presented against him at trial was insufficient to convict him of any charges. The government opposes, arguing that there was sufficient evidence presented to merit a jury verdict of guilty on all four counts.

---

[5] Following Beckford's testimony for the defense, the government sought to introduce testimony by Special Agent O'Malley regarding a statement by defendant from the October 31, 2006 proffer session that "Bourne asked Roberts to remove the bags off the Barbados flight the night of November 5th, 2005," and that "CBP inspectors seized five kilograms of cocaine off this flight." (T. 642.) The government sought to rehabilitate Beckford through these statements, asserting that the defense had attacked Beckford's recollection of what happened on November 5th. (T. 644.) The court denied the request, deeming it cumulative and prejudicial. (T. 648.) It also noted that the substance of this additional statement was available for use in summations, as it was already in evidence. (T. 645-46, 648.)

[6] The court overruled defendant's objection to this portion of the government's summation. (T. 728.)

## 1. Legal Standard

Rule 29 "imposes a heavy burden on the defendant, whose conviction must be affirmed if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . ." *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) (internal quotation marks omitted). A court's conclusion that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt" must be based on its consideration of "all of the evidence, direct and circumstantial . . . ." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (internal quotation marks and citation omitted).

On a post-verdict motion for a judgment of acquittal, a trial court may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Cote*, 544 F.3d at 99 (internal quotation marks omitted). Instead, "the court must give full play to the right of the jury to determine credibility, and must draw all possible inferences in favor of the government." *Id.*; *see also United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006). In other words, the court must "[v]iew[] the evidence in the light most favorable to the government," which means "crediting every inference that the jury may have drawn in favor of the government, and recognizing that the government's evidence need not exclude every other possible hypothesis." *Eppolito*, 543 F.3d at 45 (internal quotation marks and citations omitted). Although the court must "defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence, specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks and citations omitted).

Deference to a jury's verdict "is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Eppolito*, 543 F.3d at 46 (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)).

### 2. Narcotics Charges

The defendant argues that the government did not prove that he had the knowledge and intent required to sustain his conviction on the narcotics charges. The government responds that it produced sufficient evidence under *United States v. Cruz*, 363 F.3d 187, 199 (2d Cir. 2004) to support a conviction for these crimes. In *Cruz,* the Second Circuit Court of Appeals held that, for crimes requiring proof of knowledge and specific intent, "the government may prove the requisite knowledge and specific intent by circumstantial evidence, [though] that evidence must still include some indicia of the specific elements of the underlying crime." *Id*. (citation omitted). "[S]uch indicia could include conversations directly related to the substance of the illegal activity, possession of documents related to the crime, exercise of authority within a conspiracy, receiving a share of the profits from the deal, or explicit confirmation of the nature of the crime." *Id*. (citation omitted). The court agrees with the government that the evidence presented at trial was sufficient under *Cruz* to convict the defendant of the narcotics conspiracies as well as the substantive narcotics charges.

Defendant primarily contends that the convictions are unsupported by evidence of specific intent because the evidence came largely in the form of the purportedly vague, uncorroborated testimony from Clive Beckford that

> sometime between 2003 and 2009, he unloaded from various airplanes sealed
> brick-shaped packages, gym bags that he never actually looked into to see what

was inside; that Mr. Roberts and other individuals assisted him in this effort on various dates throughout this six-year period, and that it would not always be the same people who would assist him in these endeavors.

(Def.'s Br. 6.) He claims that Beckford's lack of specificity as to dates, years, number of shipments, and participants, combined with the lack of independent corroboration of his testimony, precludes a finding, beyond a reasonable doubt, that the defendant knowingly and intentionally took part in the charged narcotics offenses. (*Id.*) Defendant's argument fails as it runs counter to the federal law of conspiracy.

The government need not corroborate every aspect of Beckford's testimony to sustain its burden of proof against the defendant, as the testimony of an accomplice may be enough, by itself, for conviction, if the jury finds that the testimony establishes guilt beyond a reasonable doubt. *See Florez,* 447 F.3d at 155. Moreover, the government need not prove that the defendant knew the identities of each and every member of the conspiracy, or that he was fully informed as to all of the details, time frame, or the scope of the conspiracy. *See, e.g.*, *Eppolito*, 543 F.3d at 47-49. Thus, the purported ambiguities identified by defendant are insufficient to warrant reversal of his conviction. Defendant's argument also fails because the government did present additional circumstantial evidence, as well as defendant's own admissions, to corroborate Beckford's testimony. *See United States v. Guzman*, 7 Fed. Appx. 45, 54-55, 57 (2d Cir. 2001) (affirming conviction for conspiracy to murder because, *inter alia*, there was sufficient corroboration of the testimony of a cooperating witness whose credibility was attacked by the defense, and testimony was not incredible on its face).

More importantly, as noted *supra*, the government presented sufficient evidence for a reasonable finder of fact to find that the defendant joined the narcotics conspiracies with an awareness of at least some of the basic aims and purposes of the unlawful agreement and with

the intent to help it succeed. The evidence also sufficed for a reasonable jury to find that the

defendant knowingly and intentionally participated in the substantive narcotics offenses. At trial,

the government presented evidence that, *inter alia*:

- The narcotics conspiracies involved the defendant, Beckford, Bourne, and another American Airlines employee named Matthew James. (T. 350.) Bourne's role in the conspiracy was primarily to make sure that the drug activities in issue would run smoothly. (T. 356.) Beckford and James helped unload drugs from the aircrafts, and Beckford also served as a lookout. (T. 356, 413.) The defendant also helped unload drugs, and used his position as "crew chief" to assign only baggage handlers who were co-conspirators to work the drug flights. (T. 357, 436-37.)[7]

- The drugs unloaded by Beckford, the defendant, and others arrived from the Caribbean on international flights. (T. 358.) The group would allow the flight to continue as a domestic flight, track the flight, and retrieve the drugs from the plane once it returned to JFK as a domestic flight to elude detection by the custom agents who inspected the international flights. (T. 358-369.)

- The drugs were stashed in a hidden compartment behind a panel in the cargo area of the planes. (T. 385-87.) The defendant and James entered the compartment on various occasions to retrieve the drugs from the hidden compartment. (T. 387.)

- The drugs retrieved by Beckford and others included cocaine and marijuana, packed in bricks and gym bags. (T. 374; *see also* T. 303-04.)

- The defendant and Bourne told Beckford that the packages that they were smuggling contained cocaine. (T. 431-32.)[8]

---

[7] Defendant asserts that Beckford "never even suggested that Mr. Roberts would only assign alleged drug ring members to work certain flights." (Reply at 1.) The court disagrees. When asked to describe the defendant's role in the drug business, Beckford specifically indicated that the defendant worked as a crew chief, and, as such, assigned teams to load and unload flights. (T. 357.) He further elaborated that it was important to have a crew chief involved in the smuggling operation to "assign the guys you want to be on the flight and isolate everything." (T. 437.) Beckford's use of the generalized pronoun "you" in describing the importance of a crew chief does not change the clear import of his testimony.

[8] The defendant argues that this testimony should be rejected in light of Beckford's subsequent testimony that the defendant "*never* used the word cocaine." (Reply at 3.) Under the circumstances of this case, the court finds it inappropriate to adopt defendant's proposed interpretation of Beckford's testimony. *See Eppolito*, 543 F.3d at 45 (finding that the court must credit "every inference that the jury may have drawn in favor of the government"). On cross-examination, defense counsel specifically asked whether the defendant (and Bourne) told Beckford that, on November 5, 2005, "there would be drugs coming off the American Airline flight 1384 from Barbados." (T. 409.) In that context, Beckford responded that the defendant "will never . . . say it was . . . drugs coming off the aircraft. He not [*sic*] going to mention. Stuff or thing coming off the aircraft." (T. 409.) A jury could have inferred that Beckford's response pertained specifically to the events of November 5, 2005, and/or given greater credence to his testimony on redirect that he knew the smuggled bricks contained cocaine because he "was told that it was cocaine"

- The defendant admitted that he assigned the regular Barbados flight crew to a conflicting flight on the night of November 5, 2005 so the crew would not be able to get to the Barbados flight carrying the drugs seized as scheduled. (T. 437, 521-22.)

- The defendant admitted that he personally unloaded the containers from the incoming Barbados flight on November 5, 2005, as instructed by Victor Bourne.[9] (T. 521-22; *see also* T. 300-01.) The defendant did not regularly unload planes in the course of his employment as an American Airlines crew chief. (T. 432-33; *see also* T. 300.)

- When the regularly-scheduled crew finally arrived from their conflicting flight, the defendant told them that he would continue to offload the flight. (T. 522.)

- The defendant admitted that he spoke with Beckford on November 5, 2005, to let him know that Bourne needed him to remove bags from the Barbados flight. (T. 522; *see also* T. 376-377.) According to the defendant, Beckford responded that he was in the terminal and would be on the ramp to assist. (T. 525.)

- On November 5, 2005, the defendant told Beckford that the flight from which the drugs were seized contained "stuff," which Beckford understood to mean narcotics. (T. 431-32, 376, 409, 522.)

- The defendant admitted that Clive Beckford and Victor Bourne assisted the defendant in unloading baggage from the Barbados flight, while the defendant operated a Cochran.[10] (T. 522; *see also* T. 378-80.)

- The defendant admitted that, after Beckford indicated that the containers on the flight were empty, Beckford and Bourne drove away with dollies full of baggage, while the defendant continued to unload what he believed were empty containers. (T. 522.)

- On November 5, 2005, CBP officers seized approximately five kilograms of cocaine from the cargo area of American Airlines Flight 1384 arriving from Barbados, which the defendant unloaded. (T. 301, 306.)

---

by "Mr. Bourne. By Mr. Roberts, too." (Tr. 431-32.) Overall, the court finds that Beckford's testimony was not incredible on its face.

[9] Defendant argues that the fact that he also brought along a person not connected to the conspiracy to help unload the plane suggests that he did not have the requisite knowledge that drugs were on the plane. This argument is unavailing. An equally plausible inference is that the defendant knew that the plane contained more than just drugs, and that it would be impossible for him to unload the flight by himself. *See Eppolito*, 543 F.3d at 45.

[10] Although this testimony is not consistent with Beckford's testimony that he did not unload baggage from the plane, it is well-established that a jury may decide how much of a witness's testimony to accept or reject. *See, e.g.*, *Palazzo ex rel Delmage v. Corio*, 232 F.3d 38, 44 (2d Cir. 2000) ("To the extent that there is a conflict in a witness's testimony, such a conflict affects the weight of the testimony, not its admissibility."). It should be noted that the court did not admit this portion of the proffer statement to impeach Beckford, but, instead, to rebut the inference that Beckford may not have been at JFK to observe the seizures on the night of November 5, 2005. (*See infra* at 19.)

- The defendant, along with Bourne, paid Beckford on approximately twenty different occasions for his work as a member of the conspiracy, with payments ranging from $2,000 to $10,000.[11] (T. 370.)

- Beckford expected payment for his role in offloading drugs from the Barbados flight on November 5, had the operation been successful. (T. 383.)

- The defendant participated in recorded conversations with Beckford that related to the defendant sending drug proceeds to Jamaica. (T. 383-84, 393-404.)[12]

Viewed in its totality and in the light most favorable the government, and crediting every inference that the jury may have drawn in favor of the government, this evidence is sufficient to establish that the defendant exercised a role of authority within the charged conspiracies, received a share of the profits from the conspiracies, knew that such profits were drug proceeds, and knew that the packages that they were smuggling contained narcotics. Similarly, the evidence suffices to establish that the defendant knowingly and intentionally participated in the importation and possession of cocaine with Beckford and other alleged co-conspirators. *See United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004) (specifying that, like the conspiracy charges, the substantive narcotics charges at issue are specific intent crimes).

For the reasons set forth above, the court will not tread upon the province of the jury and substitute the jury's determination of the weight of the evidence presented and the reasonable inferences that may be drawn from that evidence for those proposed by the defendant. *See*

---

[11] Defendant contends that Beckford's vague, uncorroborated claim that he was sometimes paid by the defendant cannot support his conviction. (Reply at 2.) He also claims the evidence is insufficient to conclude that the defendant knew he was paying Beckford for his participation in a drug conspiracy. (*Id.*) These contentions lack merit as the government need not corroborate every aspect of Beckford's testimony to sustain its burden of proof against the defendant. (*See supra* at 14.) Moreover, Beckford testified that he was paid by the defendant for retrieving drugs, and that the smuggled bricks contained cocaine. (T. 369-370, 432). The court must "defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence." *Lorenzo*, 534 F.3d at 159.

[12] Defendant notes that "there is no *direct* evidence that Mr. Roberts knew there was money in the bag," nor was it ever established that Beckford even had "*direct* knowledge" that there was money in the black plastic deli bags. (Reply at 3 (emphasis added).) The court's assessment of the sufficiency of the evidence in support of the narcotics charges must encompass "all of the evidence, direct and circumstantial[.]" *Eppolito*, 543 F.3d at 45.

*Jackson*, 335 F.3d at 180 ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence."); *see also Florez*, 447 F.3d at 154-155.[13]  Since the evidence was sufficient for a rational trier of fact to have found the essential elements of the narcotics conspiracy and substantive crimes beyond a reasonable doubt, defendant's Rule 29 motion is denied.

### B.      Rule 33 Motion for New Trial

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM P. 33.  Defendant argues the introduction of the proffer statements into evidence resulted in prejudicial error warranting a new trial pursuant to Rule 33.  He further argues that the court's failure to instruct the jury that it could not consider Beckford's guilty plea as evidence of defendant's guilt was plain error, especially in light of the prosecutor's allegedly improper remarks in his rebuttal summation that the defendant was "essentially trying to get the same deal that Clive Beckford got" during his proffer sessions.  (T. 728.)  The government responds that the proffer statements were properly admitted pursuant to Federal Rule of Evidence 801(d)(2), and a failure to instruct the jury not to consider Beckford's guilty plea does not warrant a new trial because it does not satisfy the "plain error" standard in light of defendant's failure to request such an instruction or object to the court's jury charge as given.

---

[13] The defendant cites *United States v. Martinez-Sandoval,* No. 01-cr-307 (RPP), 2003 WL 1442454, *5 n.10 (S.D.N.Y. March 6, 2003), to suggest that observing brick-like packages is not enough to conclude there was knowledge of drug contents.  (Def.'s Br. 7; Reply at 4-5).  As the government notes in its opposition, *Martinez-Sandoval* is distinguishable because the defendant in that case served primarily as a courier, had not been told the packages contained drugs and had never touched the drugs.  (Gov't's Opp. at 21 n.4.)  Here, the defendant handled drugs himself, told Beckford that they were smuggling cocaine, occupied a position within the conspiracy much higher than a courier, and was involved in multiple instances of importation.  (*Id.*)  Moreover, Beckford specifically testified that the defendant told him the smuggled packages contained drugs.  (T. 431-32.)

### 1.    Legal Standard

Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (internal quotation marks omitted). The court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," and be satisfied that "competent, satisfactory and sufficient evidence in the record supports the jury verdict." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted). However, "[o]nce the jury rendered a verdict upon an error-free trial, only a compelling reason involving substantial unfairness could justify undoing the jury's verdict and ordering a new trial." *Polouizzi,* 564 F.3d at 162.

"The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted). "[C]ourts must ... exercise Rule 33 authority sparingly and in the most extraordinary circumstances," such as where "a district court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Cote,* 544 F.3d at 101 (internal quotation marks omitted). Indeed, the "ultimate test" on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted).

### 2.    Admission of Proffer Statements

Defendant contends that the court erred by admitting his proffer statements because they were not contrary to and did not rebut any assertions or evidence elicited by the defense, and

their admission was based "on the prospective theory that the new documentary evidence that undermined Clive Beckford's credibility would be used by the defense in a way that would be contrary to Mr. Roberts's proffer statements." (Def.'s Br. 15; *see also id*. 17-19.) These arguments are readily belied by a review of the record and mischaracterize the court's reasoning in admitting the evidence in issue.

Federal Rule of Evidence 801(d)(2) allows for the introduction at trial of statements or admissions by a defendant. *See* FED. R. EVID. 801(d)(2) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is (A) the party's own statement[.]"). Statements made pursuant to an agreement with the government are similarly admissible if the defendant makes a contradictory "factual assertion" at trial—whether by presenting evidence, through questioning or during argument—and the statement sought to be introduced "fairly rebut[s]" that assertion. *United States v. Barrow*, 400 F.3d 109, 118-19 (2d Cir. 2005) (allowing admission of defendant's statements where defendant had an agreement with the government that was virtually identical to the one at issue in the case at bar). Here, defendant expressly agreed that any statements made during the proffer session could be used, *inter alia*, "as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the defendant] at any stage of a criminal prosecution." (Proffer Agmt. ¶ 3.)

Defendant's argument that the court did not adhere to this standard in admitting the proffer statements is without merit. "[I]t is well settled that for two statements to be inconsistent, they need not be diametrically opposed." *United States v. Trazka*, 111 F.3d 1019, 1024-25 (2d Cir. 1997) (internal quotation marks omitted); *see also Barrow,* 400 F.3d at 120 ("proper rebuttal is not limited to direct contradiction"). The court agrees with the government that, during the

course of trial, including prior to the introduction of defendant's statements, defendant made various statements and arguments that directly and indirectly contradicted his proffer statements. For instance, during his opening statement, the defense repeatedly called the government's reliance on Beckford "reckless," and asserted that Beckford's "uncorroborated," "bad information" should "call his *whole account* of what took place that day into serious question." (T. 293-96 (emphasis added).) Combined, the opening statement and questioning of Officer Roessel insinuated that "the agents may have even made stuff up. . . that there were other people involved in this investigation and that somehow the agents fabricated this whole case against the defendant." (T. 327-28.) The defendant further opened the door to admission of the proffer statements during Beckford's cross-examination. Counsel made inquiries that not only raised the inference that Beckford may not have been at JFK at the time of the seizure, but also challenged Beckford's testimony about his activities prior to his arrival at JFK, including his testimony that, earlier in the day, the defendant told him that drugs were coming off a Barbados flight that evening (T. 375-76.).

The court did not admit the proffer statements, as defendant claims, based on his prospective use of new documentary evidence. Rather, the statements were admitted because the defense asserted unequivocally that it would pursue the theory that "[t]here's nothing to prove [Beckford] was there [at JFK] other than [Beckford's] own statements which have now been contradicted," since "obviously [he] wasn't there until 9:38 p.m. if he was there at all." (T. 470.) In fact, defense counsel pursued this theory during his cross-examination of Charles Schimdt, prior to Special Agent O'Malley's testimony about the defendant's statements at the November 2, 2006 proffer session.

In light of the inferences that the defendant sought to raise through the introduction of Beckford's travel and work documents, the court concluded that the probative value of admitting the proffer statements would not be outweighed by their resulting prejudice. Accordingly, it allowed the introduction of the defendant's proffer statements to the extent that such statements "fairly counter[ed] and cast[] doubt on the truthfulness of factual assertions advanced, directly or implicitly," by defendant during his opening statement and cross-examination of Officer Roessel and Beckford, as well as Schmidt. *Barrow,* 400 F.3d at 119-121 (finding that defense counsel's assertions on opening statement that defendant was not the real perpetrator of the charged crimes, as well as factual assertion implied by defense counsel on cross-examination that undercover officer had fabricated events underlying a charge, triggered the waiver clause permitting prosecutors to use defendant's proffer statements as substantive evidence).

To counter defense counsel's assertion that Beckford provided the government with "bad information," and his insinuation that the defendant was not involved with the narcotics seized on November 5 (T. 294-96, 299-307, 313, 319) the court permitted the limited introduction of certain of defendant's proffer statements, specifically that: (1) he scheduled the regularly assigned crew to a conflicting flight, so that they would not reach the incoming Barbados flight from which the drugs were seized; and (2) when the regularly-scheduled crew arrived from their conflicting flight, the defendant continued to unload the flight. (T. 521-22.) In connection with defendant's implicit challenge to Beckford's testimony that the defendant told him that drugs were coming off the Barbados flight in issue (T. 415-17), the court also admitted his statements that, on November 5, 2005, Bourne called the defendant to ask him to remove baggage from the incoming Barbados flight, and that the defendant called Beckford that day to relay the contents

of his conversation with Bourne (T. 521-22).[14]  Finally, with respect to defendant's theory that

Beckford may not have observed the seizure, since "obviously [he] wasn't [at JFK] until 9:38

p.m. if he was there at all," (T. 470), the court admitted portions of defendant's proffer statement

in which he conceded that Bourne and Beckford had assisted him in unloading the Barbados

flight while the defendant operated the Cochran, and that the two drove away with their dollies

full of baggage while the defendant continued to unload the plane (T. 521-22).

As the government notes, the court's ruling reflected its ongoing analysis in the face of

the government's repeated requests for the statements' introduction, as to whether the cumulative

evidence placed before the jury by the defendant was sufficiently contradictory to the prior

statements to tip the balance in favor of admission.  (Gov's Br. at 18-29.)  The court initially

precluded the evidence, acknowledging the potential prejudice to the defendant, subject to

reconsideration should "the defense persist in presenting this theory" that, because Beckford was

not at JFK on November 5, 2005 prior to 9:38 p.m., he could not have participated in the

conversations with the defendant about which he testified, and might not have been at JFK to

observe the events surrounding the cocaine seizure in issue.  (Tr. 336-338.)  The defense was put

on notice on each occasion that "should this . . . or some other theory emerge that is contrary to

the admissions that were made by the defendant during the proffer statements, I will allow the

government to renew its application and will consider it at that point in time."  (T. 244; *see also*

---

[14] Defendant's theory that, "since there was no evidence presented regarding what time of night Mr. Roberts spoke to either individual [Bourne and Beckford], it is possible that one or both of these conversations happened after 9:38 p.m." (Def.'s Br. at 16) does not change the court's analysis that the cumulative evidence placed before the jury by the defendant was sufficiently contradictory to the prior statements to warrant admission.

T. 451-52.)  Defendant's strategic choice to continue his attack on Beckford's credibility in ways that ran afoul of his prior admissions does not compel a new trial.[15]

In sum, the admission of the proffer statements does not warrant a new trial under Rule 33, because it did not yield a seriously erroneous result or a miscarriage of justice.  *See Cote,* 544 F.3d at 101.  The defendant failed to meet his burden of proving that letting his guilty verdict stand would be a manifest injustice.  *See Canova*, 412 F.3d at 349.[16]

### 3.   Jury Instruction

In the Second Circuit, "when a jury has been informed that a codefendant has pleaded guilty to a crime charged against the defendant on trial, the trial judge should instruct the jury that they may not consider that guilty plea as evidence of the defendant's guilt."  *United States v. Ramirez*, 973 F.2d 102, 105 (2d Cir. 1992) (citations omitted); *see also United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999) (noting that "[s]uch an instruction is necessary because admission of a co-defendant's guilty plea can be extremely prejudicial to defendant, given the natural human tendency to assume that if an aider and abettor is guilty, the principal must also be guilty") (internal quotation marks omitted).

Defendant contends that he is entitled to a new trial under Rule 33 on the ground that the court did not instruct the jury that Clive Beckford's guilty plea should not be considered as evidence of defendant's guilt.  He complains that the omission was especially prejudicial in light of the prosecutor's closing remarks that the proffer statements are credible because they were made while the defendant was "trying to essentially get the same deal that Clive Beckford got."

---

[15] Contrary to defendant's contention, the existence of evidence regarding Beckford's travels on November 5, 2005 does not give the defense license to use that evidence to make arguments contrary to defendant's proffer statements without triggering admission of those statements.  (*See* Def.'s Br. at 17-18; Reply at 8.)

[16] The court notes that the defendant engaged in several proffer sessions and gave numerous statements to the government about his involvement in the narcotics importation conspiracy.  The court substantially limited the number of statements the government could introduce.

(Tr. 728.) The defense did not request this instruction in anticipation of or during trial despite having ample opportunity to do so.[17] When a defendant does not request a jury instruction, a reviewing court will consider the absence of such an instruction under a "plain error" standard. *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009).

Before a court "can correct error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citations and internal quotation marks omitted). "Meeting all four prongs is difficult, 'as it should be.'" *Puckett v. United States,* 129 S. Ct. 1423, 1429 (2009) (quoting *United States v. Dominguez Benitez,* 542 U.S. 74, 83, n.9 (2004)).

Defendant has not shown that the court's failure to give a *sua sponte* instruction regarding jury's consideration of Beckford's guilty plea was "plain error" that affected his substantial rights. In light of the evidence supporting defendant's conviction, as noted *supra* in Part IIA, the court cannot find that, had it instructed the jury not to consider Beckford's guilty plea as evidence of the defendant's guilt, the defendant might have been acquitted. *See Puckett*, 129 S. Ct. at 1429 (internal quotation marks omitted) (finding that, to warrant a new trial, "the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings."). The testimony

---

[17] On March 18, 2009, the court gave the parties an opportunity to submit proposed jury charges for its consideration by June 1, 2009. On June 5, 2009, the court granted defendant's request for an extension of time to submit his proposed charges until June 12, 2009. Defendant's June 12 submission did not include a request for an instruction on assessing a co-conspirator's guilty plea. Furthermore, on June 25, 2009, the court posted a draft of its final jury charge for review by counsel, and subsequently amended the charge to incorporate revisions approved by both parties at the charge conference. Defendant again failed to request the instruction in issue. The defense also failed to ask for a curative instruction during the course of trial, even in connection with his objections to the government's references to the proffer statements as reflective of the defendant's efforts to cooperate with the government. (*See* Tr. 518-21, 728.) Significantly, after the court concluded its jury charge, the court asked both parties at sidebar if there were any objections to the charge. (T. 789.) Neither side expressed any. (*Id.*)

from Beckford and Special Agent O'Malley concerning defendant's admissions, particularly when considered in conjunction with the recorded conversations and the testimony of Agent Roessel and Agent McAlpin, was sufficient for the jury to find the defendant guilty.

Defendant's challenge also fails because he cannot demonstrate that "he sustained any prejudice or that the fairness, integrity, or public reputation of his judicial proceedings was called into question." *United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009); *see also United States v. Kaplan,* 490 F.3d 110, 124 (2d Cir. 2007) (noting that "defendant asserting plain error" generally "bears the burden of persuasion as to prejudice"); *Cote,* 544 F.3d at 101 ("[C]ourts must ... exercise Rule 33 authority sparingly and in the most extraordinary circumstances.") (internal quotation marks omitted). As the government notes, the prosecution accurately stated that the defendant had tried to cooperate, a fact that was properly before the jury pursuant to Special Agent O'Malley's testimony. (*See* Gov't's Opp. at 32-33.) The government did not misrepresent that the defendant admitted his guilt, which is precisely what he did in his proffer statements, consistent with the goal of the session, which was for the defendant to "provide the [U.S. Attorney's] Office with information, and to respond to questions, so that the Office may evaluate [defendant]'s information and responses in making prosecutorial decisions." (Proffer Agmt. ¶ 1.) *See McCourty*, 562 F.3d at 475 (2d Cir. 2009) (before ordering a new trial, "a district court must find that there is a real concern that an innocent person may have been convicted") (internal quotation marks omitted). Accordingly, the instruction's omission does not warrant a new trial under Rule 33.

## CONCLUSION

For the reasons set forth above, defendant's motions are denied in their entirety.


SO ORDERED.

Dated: Brooklyn, New York
      January 13, 2009

_____/s/_____
DORA L. IRIZARRY
United States District Judge
